D. Maimon Kirschenbaum
Lucas C. Buzzard
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
**BENJAMIN LEVIN,**

       **Plaintiff,**

  v.

**WELLS FARGO BANK, N.A.,**

       **Defendant.**
--------------------------------------------------------x

**COMPLAINT**

**CASE NO.:**

Plaintiff Benjamin Levin alleges as follows:

### INTRODUCTION

1. Plaintiff Benjamin Levin was an exceptional employee at Wells Fargo, so much so that in February 2021, Wells Fargo sought to ensure that his "critical" knowledge and experience remained at the Bank by offering him a retention contract under which he would be entitled to a retention bonus if he remained continuously employed through a "completion date" of January 31, 2022.

2. Honoring his end of the contract, Plaintiff remained employed at Wells Fargo from February 2021 through the January 31, 2022 completion date. During that time, Plaintiff maintained a performance rating of "exceeds expectations," did not receive any corrective actions, and was not issued any formal warnings or notices.

1

3. In the Spring of 2022—months after the completion date—Wells Fargo notified Plaintiff that it would not be paying his retention bonus because the Bank had determined that he would be issued a formal warning. The purported basis for this formal warning was a one-time incident that occurred nearly one year prior, in April 2021, when Plaintiff forgot to enter into Wells Fargo's system a "loan note" in connection with a customer's changed estimate of their property value. Although Plaintiff's first- and second-level managers defended his actions and argued for an informal citation in connection with this incident, Wells Fargo ignored those recommendations to supposedly issue Plaintiff with a formal warning, which he was never provided and has never seen.

4. It is clear that Wells Fargo's supposed determination to issue Plaintiff a formal warning in the Spring of 2022 in contravention of the recommendations of both his immediate supervisors, and then apply that formal warning retroactively so that it affected his retention bonus that was already earned as of the completion of the contract, was nothing more than a convenient excuse to save the Bank money and withhold Plaintiff's earned wages.

5. Plaintiff now brings this action for breach of the retention bonus contract and for failure to pay earned wages in violation of the New York Labor Law.

## JURISDICTION AND VENUE

6. Plaintiff brings this action against Defendant, alleging claims of breach of contract and failure to pay earned wages in violation of the New York Labor Law ("NYLL", N.Y. Lab. Law §§ 193 & 198).

7. This Court has diversity jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332 because (1) Plaintiff is a citizen and resident of New York; (2) Defendant is a national banking association that, as listed in its articles of association, has its main office in Sioux Falls, South

Dakota and is headquartered in San Francisco, California; and (3) the value of Plaintiff's claims exceeds $75,000.

8. Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

9. Defendant Wells Fargo N.A. ("Wells Fargo") is a national banking association that, as listed in its articles of association, has its main offices in Sioux Falls, South Dakota. Wells Fargo's national headquarters are in San Francisco, California. Wells Fargo has offices throughout the United States, including New York.

10. Plaintiff Benjamin Levin was employed by Wells Fargo from November 2010 until April 2022.

## FACTS

11. Defendants committed the acts alleged in this Complaint knowingly, intentionally and willfully.

12. Plaintiff was hired by Wells Fargo in November 2010.

13. In 2021, Plaintiff was a Sales Supervisor in Wells Fargo's Private Mortgage Banking division. In that role, Plaintiff's duties were to self-source mortgage business and service Wells Fargo's home lending customers. As a supervisor, Plaintiff was also responsible for recruiting, training, and organizing other employees to source mortgage business for the Bank.

14. Plaintiff's immediate supervisor was James Easton. His second-level supervisor was Eric Gotsch.

15. Plaintiff was an excellent employee who consistently received performance ratings of "exceeds expectations."

16. On February 26, 2021, in recognition of Plaintiff's "contributions, knowledge, and experience," which Wells Fargo deemed "critical" to its business, Wells Fargo offered Plaintiff a written agreement containing a retention bonus opportunity (the "Retention Bonus Agreement").

17. The Retention Bonus Agreement provided for a two-part retention bonus if Plaintiff agreed "to continue working for Wells Fargo" in his then-current role "and to devote [his] entire working time to executing [his] duties at an acceptable performance level" from the date of the Agreement through a "Completion Date" of January 31, 2022.

18. The first part of the retention bonus consisted of monthly credits of additional "basis points" applied to Plaintiffs' monthly production for each month Plaintiff continued to work for Wells Fargo without leaving its employment for any reason, "provided [Plaintiff met] the additional requirements for a Retention Bonus" set forth later in the Agreement.

19. The second part of the retention bonus consisted of a "one-time Retention bonus payment" that Plaintiff would receive if he was "continuously employed in [his] PMB Sales Supervisor role through a Completion Date of January 31, 2022." The amount of this second part of the retention bonus was to be calculated based on Plaintiff's total funded volume between February 1, 2021 and January 31, 2022. Payment of the one-time retention bonus was to be "made on the last pay date in March 2022."

20. The Retention Bonus Agreement further provided that "to earn any Retention Bonus payment described in th[e] agreement," Plaintiff was required to meet "the following performance standards through the Completion Date."

21. First, Plaintiff was required to "demonstrat[e] . . . effective partnership and risk management of [his] Mortgage Consultant Activities."

22. Second, Plaintiff was required to "maintain a performance rating of at least 'meets expectations' with no corrective action" and "[m]ay not be on a formal warning or final notice at any time."

23. Finally, Plaintiff was required to comply with Wells Fargo's "employment policies," including its "Code of Ethics and Business Conduct."

24. Plaintiff accepted and executed the Retention Bonus Agreement on February 27, 2021.

25. Plaintiff performed all requirements of the Retention Bonus Agreement through the January 31, 2022 Completion Date.

26. Plaintiff remained employed with Wells Fargo through January 31, 2022.

27. Each month from February 2021 through the end of January 2022, Plaintiff received his monthly credits constituting the first part of the retention bonus.

28. In January or February 2022, Plaintiff was given his annual performance evaluation for 2021 and received an overall rating of "exceeds expectations."

29. Plaintiff did not receive any formal warning or final notice at any time before January 31, 2022.

30. Plaintiff earned his retention bonus as of the Completion Date, January 31, 2022.

31. Between February 2021 and January 31, 2022, Plaintiff received multiple offers from other companies to leave Wells Fargo and come work for them. In reliance on the Retention Bonus Agreement, Plaintiff remained at Wells Fargo and did not accept any of those offers.

32. On or about March 12, 2022, Plaintiff received a text message from his immediate supervisor, James Easton, informing Plaintiff that Easton had to write up a business justification regarding entries made in April 2021 on a mortgage application for one of Plaintiff's clients.

33. The entries in question concerned the client's estimate of the value of his property on his application for a mortgage refinance. During the COVID-19 pandemic, Wells Fargo changed its policies such that it would not allow appraisers to enter any homes to value the properties. The upshot of this policy was that, in the absence of an actual appraised value for the property, Wells Fargo would move forward with a loan only if its automated decision engine authorized an "appraisal waiver" based on the information included on the mortgage application. Any valuation of the home above $1 million made the property ineligible for this appraisal waiver.

34. One problem with this system was that mortgage applicants would submit online mortgage applications that contained numerous mistakes or inaccuracies, and the automated decision engine would immediately run using the customer's entries. However, Plaintiff and his colleagues were responsible for reviewing those applications and then contacting the customers to make any necessary corrections. But because the automated decision engine had already run based on the information the customer entered, any changes made to the application based on Plaintiff's review – no matter how minor – would require the decision engine to run again based on the new information.

35. One common problem with customers' mortgage applications was the entry of arbitrary or unsupported valuations for customers' properties. Wells Fargo's directives as to what to do in such circumstances were not very clear and were constantly evolving. In general, however, Plaintiff and his colleagues were permitted to check customer valuations by reference to the property's purchase price, previous appraisals, or online real estate listing platforms such as Zillow

or Redfin. If there was a noticeable difference between the customer's valuation and these valuation tools, Plaintiff and his colleagues were permitted to ask questions of the customer to help them determine the value. If, based on these conversations, the customer changed the valuation of their property after the decision engine had run, Plaintiffs and his colleagues were required to enter a "loan note" into Wells Fargo's system.

36. Given the enormous number of applications Plaintiffs and his colleagues were required to review, and the number of mistakes and inaccuracies entered by the customers on those applications, it was not surprising that employees in Plaintiff's position occasionally forgot to enter loan notes. Wells Fargo recognized this reality by continuously updating its programs such that when an employee made a change to a customer's input, a "pop up" window would automatically appear and ask the employee to enter the reason for the change. However, in April 2021, this automated "pop up" system had not been implemented for customers' property valuations.

37. In April 2021, one of Plaintiff's clients in California, who had purchased his home approximately six months before that for approximately $955,000, approached Plaintiff wanting to refinance his mortgage. Plaintiffs sent the client the application to complete online, and the client entered an estimated value of his property of $1.1 million.

38. When Plaintiff reviewed the application with the client, he asked the client why he had entered $1.1 million as the property's value. The client told Plaintiff that he had made a mistake and asked Plaintiff to change the valuation to the $955,000 purchase price. Plaintiff did as the client requested, which was permitted by Wells Fargo policy. In so doing, however, Plaintiff forgot to enter a "loan note" into the system indicating that the change had been made pursuant to the client's request.

39. Plaintiff heard nothing further on this issue until December 2021, when he was contacted by a Wells Fargo internal investigator who reviewed the appraisal waiver policy with Plaintiff and asked him about the April 2021 loan. During the conversation, Plaintiff pulled up the loan file and realized for the first time that he had forgotten to enter the loan note. Plaintiff told the investigator of his mistake and the call ended.

40. Plaintiff again heard nothing further about this issue until the March 12, 2022 text message from his supervisor, Easton, discussed above. Easton advised Plaintiff that he and his manager, Eric Gotsch, had to write up what happened with the April 2021 loan, and that when doing so, they would defend Plaintiff's actions. Easton later told Plaintiff that he and Gotsch wrote a strong defense of Plaintiff's actions arguing for, at most, an informal warning given that it was a one-time mistake and obviously not made with any ill intent.

41. Several days later, Plaintiff received a call from Robert Schroeder, his new division manager, in which Schroeder told him that Wells Fargo was holding off on the payment of the one-time retention bonus until it made a determination as the April 2021 loan issue, but he was hopeful it would be a favorable outcome for Plaintiff. Schroeder promised to give Plaintiff daily updates on the matter but failed to do so.

42. In approximately late April or early May 2022, after Plaintiff had resigned from Wells Fargo, he was told by Eric Gotsch that the Bank had finally decided that if he had stayed at Wells Fargo, he would have been issued with a formal written warning because of this one-time incident. Gotsch told Plaintiff that because he would have been issued a formal warning, he was not eligible for the one-time retention bonus. He was, however, eligible to return to Wells Fargo if he ever wished to do so.

43. Plaintiff was never provided a copy of this purported formal written warning against him.

44. Based on Plaintiff's experience at Wells Fargo, it was not in the ordinary course for the Bank to disregard and override the recommendations of an employee's first and second level supervisors as to the appropriate course of action to take with respect to an employee's performance.

45. Throughout the entirety of his career at Wells Fargo, Plaintiff had never received any other formal warning.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract – New York Law)**

46. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

47. The Retention Bonus agreement is a contract that was offered by Wells Fargo on February 26, 2021, and accepted by Plaintiff on February 27, 2021.

48. In reliance on the Retention Bonus agreement, Plaintiff remained at Wells Fargo until after the agreement's January 31, 2022 completion date.

49. Plaintiff performed or substantially performed all requirements of the Retention Bonus agreement through the Completion Date.

50. Defendant breached the Retention Bonus agreement by failing to pay Plaintiff the one-time retention bonus.

51. As a direct and proximate result of Defendant's breach, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including the amount of the one-time retention bonus payment.

52. As a result of Defendants' breach, Plaintiff is entitled to damages, including but not limited to payment of the amount of the one-time retention bonus.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract Caused by Wells Fargo's Breach of the Implied Covenant of Good Faith & Fair Dealing – New York Law)

53. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

54. Pursuant to New York law, a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance and prohibits a party to the contract from doing anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

55. Wells Fargo acted in bad faith and breached the covenant of good faith and fair dealing implicit in the Retention Bonus Agreement.

56. Wells Fargo's bad faith is demonstrated by, *inter alia*: (1) the fact that it did not investigate the April 2021 mortgage application until December 2021, the month before the Completion Date of the Retention Bonus Agreement; (2) disregarded the recommendations of Plaintiff's first and second level supervisors to supposedly issue Plaintiff with a formal warning; (3) failed to provide Plaintiff with a copy of that supposed formal written warning; and (4) issued the supposed formal written warning after the Completion Date and then applied it retroactively to deny Plaintiff the fruits of the Retention Bonus Agreement.

57. Defendant's breach of the implied covenant of good faith and fair dealing constitutes a breach of the Retention Bonus Agreement.

58. As a direct and proximate result of Defendant's breach, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including the amount of the one-time retention bonus payment.

59. As a result of Defendants' breach, Plaintiff is entitled to damages, including but not limited to payment of the amount of the one-time retention bonus.

### THIRD CLAIM FOR RELIEF
### Failure to Pay Earned Wages
### N.Y. Lab. Law §§ 193, 198

60. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

61. Defendant withheld Plaintiff's earned retention bonus in violation of N.Y. Lab. Law § 193.

62. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages in the amount of the retention bonus, liquidated damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. An award of damages, according to proof, including liquidated damages, to be paid by Defendant;

B. Costs of action incurred herein, including expert fees;

C. Attorneys' fees pursuant to N.Y. Lab. Law § 198;

D. Pre-judgment and post-judgment interest, as provided by law; and

E. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated: New York, New York         Respectfully submitted,

March 24, 2023                    JOSEPH & KIRSCHENBAUM LLP

                                  By:
                                  */s/ Lucas C. Buzzard*
                                  D. Maimon Kirschenbaum
                                  32 Broadway, Suite 601
                                  New York, NY 10004
                                  Tel: (212) 688-5640
                                  Fax: (212) 688-2548

                                  *Attorneys for Plaintiff*